IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| **SHIRLEY A. THOMPSON DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:25-cv-452-CWB** |
| | ) | |
| **AMERICAN MULTI-CINEMA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I. Introduction

This action involves a slip and fall suffered by Shirley Davis while leaving a movie theater owned and operated by American Multi-Cinema, Inc. (*See* Doc. 1-2). Proceedings initially were brought in the Circuit Court of Montgomery County (*see id.*) but later were removed to this court by AMC (*see* Doc. 1). AMC now seeks an entry of summary judgment in its favor. (*See* Doc. 36). The summary judgment arguments have been briefed at length and are ripe for determination. (*See* Docs. 37, 43, & 44). After careful consideration, the court concludes that summary judgment is due to be denied as to negligence but granted as to wantonness.

### II. Jurisdiction and Venue

Davis is a citizen of the state of Alabama. (*See* Doc. 18 at p. 1, ¶ 3). AMC is a foreign corporation that is statutorily deemed a citizen of the state of Missouri and the state of Kansas. (*See* Doc. 20 at p. 2, ¶ 2). And the court finds that the amount in controversy at all times has more likely than not exceeded $75,000.00 exclusive of interest and costs. (*See* Doc. 1). Subject matter jurisdiction therefore exists pursuant to 28 U.S.C. § 1332(a)(1). Neither personal jurisdiction nor venue has been contested, and the record supports both. *See* 28 U.S.C. § 1391; *see also* FED. R. CIV. P. 4(k)(1)(A).

## III. Legal Standard

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. … [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (citation omitted).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That responsibility may be satisfied by identifying portions of the record that negate an essential element of the plaintiff's claim. *Id.* Alternatively, a movant who does not have a trial burden of production may show that the nonmoving party "cannot produce admissible evidence to support [a] fact." FED. R. CIV. P. 56(c)(1)(B); *see also* advisory committee's note ("[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."); *Celotex*, 477 U.S. at 322-23. Under either scenario, the burden then shifts to the nonmoving party to establish that a genuine dispute of material fact exists as to each element of the underlying claims. *Celotex*, 477 U.S. at 324; *see also* FED. R. CIV. P. 56(c)(1).

To establish a genuine dispute of material fact, the nonmoving party must produce such evidence as would be sufficient for a reasonable trier of fact to return a verdict in its favor. *See* *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) ("Once the moving party makes the required showing, the burden shifts to the non-moving party to rebut that showing

by producing affidavits or other relevant and admissible evidence beyond the pleadings."). When evaluating whether a genuine dispute of material fact exists, the court must view all evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). So too is it well settled that "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1335 (11th Cir. 2024) (citation omitted); *see also Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985) ("[A]n inference based on speculation and conjecture is not reasonable.") (citation omitted).

## IV. Factual Background[1]

Davis visited the AMC theater location at Chantilly Cinema in Montgomery, Alabama on the afternoon of May 21, 2023. (Doc. 37-2 at p. 9, depo. p. 29). As shown in AMC's surveillance video (Doc. 37-3), Davis fell while walking in the exit corridor after watching her chosen movie (Doc. 37-2 at pp. 9-10, depo. pp. 30-31, 35). The surveillance video further shows that the fall occurred immediately next to one of two yellow caution signs placed in the central area of the exit corridor. (Doc. 37-3). Davis was attended to promptly by other patrons and AMC personnel. (*Id.*).

---

[1] The facts as stated herein are taken from the evidentiary exhibits attached to the parties' summary judgment filings, reflect only the facts deemed material to a proper resolution of the summary judgment issues, and have been construed most favorably to Davis as the non-movant.

Davis testified under oath that she did not observe either of the yellow caution signs prior to the incident. (Doc. 37-2 at p. 10, depo. pp. 33-34). However, Davis acknowledged under oath that there was nothing blocking her view of the signs and that she generally would have understood such signs to indicate that "apparently something was on the floor." (*Id.*). The surveillance video likewise reflects that the yellow caution signs were not obscured by any physical obstructions. (Doc. 37-3).

As to the reason for her fall, Davis testified that she did not see any hazard in advance but later was told by an AMC employee that there had been "popcorn butter spraying from the vent." (Doc. 37-2 at p. 10, depo. pp. 34, 36). According to Davis, the employee described the condition of the floor as such a common occurrence that AMC had specifically instructed the location's employees to wear rubber bottom shoes. (*Id.* at pp. 10-12, depo. pp. 36-37, 42). It is undisputed that the door next to where Davis fell provides access into the room that houses the popcorn machines. (Doc. 43-4 at p. 15, depo. pp. 58-59). The corporate representative for AMC confirmed that employees travel back and forth between the popcorn machines and the exit corridor, that it is possible for butter to spill from the machines, and that employees are required to wear "slip-resistant" shoes. (Doc. 43-4 at pp. 9, 15, 20, depo. pp. 35-36, 59, 79). The surveillance video shows Davis's right foot appearing to slide forward suddenly (Doc. 37-3), and Davis testified that she discovered a greasy substance on her pants after the fall (Doc. 37-2 at p. 11, depo. p. 39). Other patrons can be seen on the surveillance video "testing" the area to demonstrate the presence of a slippery substance, and AMC personnel can be seen mopping afterward. (Doc. 37-3).

The record also contains written statements from two AMC employees who were present on the day of the incident. (Doc. 37-4; Doc. 37-5). The statement from an on-duty supervisor conceded that Davis "slipped where we had some butter tracked out from our popcorn station."

(Doc. 37-4). The statement from the interim general manager similarly acknowledged that "[u]pon further inspection another mopping with degreaser was needed." (Doc. 37-5). It appears from the record that the area had been mopped earlier in the day. (Doc. 37-4; Doc. 37-5). Although the AMC corporate representative testified that butter spills should be cleaned using "a fresh mop, a brand-new mop head," and degreaser, the record is unclear as to the type of mop and cleaning products were used. (Doc. 43-4 at pp. 15-16, depo. pp. 57, 63-64).

## V. Discussion

The core factual allegations in the Complaint are that Davis "suffered a fall resulting from a hazardous walkway," that AMC "was aware or should have been aware of the presence of the hazardous condition," and that AMC "failed to remedy the dangerous condition." (Doc. 1-2 at p. 9, ¶¶ 4-7). Davis thus purports to assert four legal theories of recovery:

- Count One – Negligence;
- Count Two – Wantonness;
- Count Three – Premises Liability; and
- Count Four – Respondeat Superior.

(*Id*. at pp. 10-15). "A federal court sitting in diversity jurisdiction applies the substantive law of the forum state, which, in this case, is Alabama." *J&M Assocs., Inc. v. Romero*, 488 F. App'x 373, 376 (11th Cir. 2012) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." (citing *Erie*, 304 U.S. at 78)). Here, all parties agree that Alabama substantive law controls.[2]

---

[2] Alabama choice of law principles in tort cases look to the law of the place of the injury, *i.e.*, Alabama. *See Ex parte U.S. Bank Nat'l. Ass'n*, 148 So. 3d 1060, 1069 (Ala. 2014) ("*Lex loci delicti* has been the rule in Alabama for almost 100 years.") (citation omitted).

**A. Wantonness**

The Complaint alleges that AMC "wantonly caused or allowed [Davis] to fall upon the floor at their premises and failed to keep and maintain its premises in a manner to be free and clear of the hazardous condition and to warn its invitees of the aforementioned conditions." (Doc. 1-2 at p. 12, ¶ 20). However, Davis has informed the court that she "concedes her wantonness claims" (Doc. 43 at p. 1), and AMC has accepted the concession (Doc. 44 at p. 1).

**B. Negligence**

Count One of the Complaint, which is styled "Negligence," is based upon allegations that Davis was a business invitee of AMC's movie theater and that AMC "negligently caused or allowed [her] to fall upon the ground of their premises due to their failure to keep and maintain their premises to be free and clear of the hazardous condition." (Doc. 1-2 at p. 10, ¶ 14). It is more specifically alleged that AMC "had actual or constructive notice and/or [was] delinquent in not discovering and removing the hazardous condition, and [was] negligent … in affirmatively creating the hazard or not warning their patrons of said hazardous condition that was situated in a dangerous area and/or location inasmuch as it was located in an area that was regularly traveled by guests, patrons or invitees" (*id.* at p. 11, ¶ 15) and further "[was] negligent in failing to remedy … this dangerous condition that existed on their premises and was a hazard to their guests or invitees" (*id.* at ¶ 16).

On the issue of a premises owner's duty to its customers, the Alabama Supreme Court has explained as follows:

> Alabama law is well-settled regarding the scope of the duty an invitor owes a business invitee. "The owner of premises owes a duty to business invitees to use reasonable care and diligence to keep the premises in a safe condition, or, if the premises are in a dangerous condition, to give sufficient warning so that, by the use of ordinary care, the danger can be avoided." *Armstrong v. Georgia Marble Co.*, 575 So. 2d 1051, 1053 (Ala. 1991) ....

*Joseph v. Caritas of Birmingham*, No. SC-2025-0389, 2026 WL 1262203, at *4 (Ala. May 8, 2026) (citation modified); *see also Galaxy Cable, Inc. v. Davis*, 58 So. 3d 93, 98 (Ala. 2010) ("A person who enters land with the landowner's consent to bestow some material or commercial benefit is an 'invitee,' and a landowner owes an invitee the duty to keep the premises in a reasonably safe condition and, if the premises are unsafe, to warn of hidden defects and dangers that are known to the landowner but that are hidden or unknown to the invitee.").

AMC first contends that Davis "cannot identify a dangerous condition." (Doc. 37 at p. 5). AMC points to Davis's testimony that she did not see any hazardous condition and was unaware of what caused her to fall. (*Id.*). AMC further points to its own employee statements that the area had been mopped earlier in the day and that no immediate spill was found in the aftermath of the fall. (*Id.*). But the evidentiary material relied upon by AMC does not *ispo facto* preclude the existence of a genuine dispute of material fact.

The record also contains evidence that could lead a reasonable jury to conclude that a dangerous condition indeed was the cause of Davis's fall. For example, the presence of yellow caution signs in the immediate area of the fall provides indicia that such a condition might exist. *See Johnson v. Logan's Roadhouse, Inc.*, No. 14-cv-2037, 2016 WL 4585927, *5 (N.D. Ala. Sept. 2, 2016) ("[T]he fact that Logan's placed a wet floor sign in or around the restroom demonstrates that Logan's was aware of at least some water on the restroom floor."). Moreover, Davis testified that AMC personnel informed her that "it was popcorn butter spraying from the vent" (Doc. 37-2 at p. 10, depo. p. 36) and that she discovered a greasy substance on her pants after the fall (*id.* at p. 11, depo. p. 39). Davis further testified that another patron acknowledged "[t]here's something shiny on the floor" and then demonstrated that the floor in the area in fact was slippery. (*Id.* at p. 12, depo. p. 42; *see also id.* at pp. 13-14, depo. pp. 48-49). And it appears

from the surveillance video that Davis's right foot slipped forward in a manner that would be consistent with the presence of a slippery substance on the floor. (Doc. 37-3). The actions of others on the video are consistent with that interpretation. (*Id.*). Finally, with respect to the written statements given by AMC personnel, one expressed that Davis "had slipped where we had some butter tracked out from our popcorn station" and specifically identified "butter on the floor" in response to the heading "Any defects, debris or hazards in the area." (Doc. 37-4 at p. 2). The other statement similarly expressed that "[u]pon further inspection another mopping with degreaser was needed." (Doc. 37-5 at p. 2).

AMC next contends that Davis "cannot show that any alleged defect was due to AMC's negligence, or that AMC knew about any alleged defect." (Doc. 37 at p. 6). But that argument ignores the above-referenced testimony that AMC personnel acknowledged both on the scene and in contemporaneous written statements that butter from the popcorn machine was present on the floor in the area of the fall. (Doc. 37-2 at pp. 10, 12-14, depo. pp. 36, 42, 48-49; Doc. 37-4; Doc. 37-5). It further ignores evidence that AMC was aware enough of the general butter-on-the-floor issue that it had instructed employees to wear protective footwear:

> Q. Okay. What do you think caused you to fall?
>
> A. I didn't know what had caused me to fall, but after standing at the door, the young lady that worked there, she came to and explained that it was popcorn butter spraying from the vent. And I asked her questions, and she said they told her all the employees need to wear rubber bottom shoes.

(Doc. 37-2 at pp. 10-11, depo. pp. 36-37; *see also id.* at p. 12, depo. p. 42 & Doc. 43-4 at pp. 9, 15, 20, depo. pp. 35-36, 59, 79).

It is true that AMC apparently took action earlier in the day to remediate the potential hazard. (Doc. 37-4 at p. 2: noting that "the floor was mopped before opening that same day"). However, a reasonable jury could conclude that a single pre-opening mopping—with no

follow-up mopping by the afternoon—was not enough for an area known to accumulate butter residue from the theater's popcorn equipment. The surveillance video provides further evidence for Davis to argue that the condition of the floor was such that it could have been and should have been discovered by AMC with the exercise of reasonable diligence, *i.e.*, multiple individuals other than Davis can be seen highlighting the degree of slipperiness in the area. (Doc. 37-3). Moreover, Alabama law would presume knowledge by AMC if a jury found the evidence to show that AMC employees or equipment created the condition. *See Wal-Mart Stores, Inc. v. Rolin*, 813 So. 2d 861, 864 (Ala. 2001) (citing *Wal-Mart Stores, Inc. v. McClinton*, 631 So. 2d 232, 234 (Ala. 1993)).

With a jury issue existing as to whether a hazardous condition was present and known by AMC, the question becomes whether AMC discharged its duty as a business owner by providing sufficient warning of the condition. Again, the record establishes that two yellow caution signs had been placed in the exit corridor near the area where Davis fell. (Doc. 37-3; Doc. 37-2 at p. 9, depo. p. 32). So AMC clearly took some action aimed at warning patrons such as Davis that the area could pose a danger. But the adequacy of the warning is up for debate. On the one hand, it is beyond dispute that the yellow caution signs were prominently displayed in the center area of the exit corridor and that no physical obstructions existed so as to have blocked a patron's view. (Doc. 37-2 at p. 10, depo. pp. 33-34; Doc. 37-3). Yet on the other hand, the record also contains evidence that the change in lighting conditions from the dark theater/hallway area to the brighter exit corridor affected Davis's ability to take in the surroundings:

> Q. Okay. Did you -- on the day that you -- of this incident, did you see those caution signs as you were approaching?
>
> A. Actually, when you get to that corner and you turn, you cannot focus because, as I said earlier, it wasn't that bright at all. And coming out of the dark hall, you know, the darker hall, you really couldn't visualize too much.
>
> Q. Okay.

A. Especially after quickly turning to go because you're not expecting anything.

(Doc. 37-2 at p. 10, depo. p. 33; *see also id*. at p. 10, depo. pp. 35-36). That testimony is consistent with numerous other patrons shown on the surveillance video to have walked from the theater/ hallway area into the exit corridor and likewise to have made no attempt to avoid the area around the yellow caution signs—even when escorting children or the elderly. (Doc. 37-3). Such conduct would preclude summary judgment even if the yellow caution signs are presumed visible—as a reasonable jury could conclude that the information conveyed by the signs was inadequate "to give sufficient warning so that, by the use of ordinary care, the danger can be avoided." *Armstrong v. Georgia Marble Co*., 575 So. 2d 1051, 1053 (Ala. 1991) (citation omitted).[3]

Finally, AMC contends that it had no duty to remedy the alleged hazard because the presence of the yellow caution signs would have rendered any such hazard "open and obvious." (Doc. 37 at p. 7). A business owner's general duty of care indeed is excused as to conditions that are open and obvious. *See Joseph*, 2026 WL 1262203 at *4 ("There is no duty to remedy, or to warn about, open and obvious hazards." (quoting *Owens v. Ganga Hosp., LLC*, 352 So. 3d 1172, 1174-75 (Ala. 2021)). And a condition is deemed open and obvious "if it would be apparent to, and recognized by, a reasonable person in the position of the invitee." *Id*.

---

[3] AMC repeatedly refers to the yellow caution signs as "wet floor signs" (Doc. 43-4 at p. 12, depo. p. 46; Doc. 37-4; Doc. 37-5) but has not shown the signs in a format where the court can discern whether those words actually appear for patrons to read. A simple warning of "Caution" as described by Davis (Doc. 37-2 at p. 9, depo. p. 32) could just as well refer to a risk of a hazard posed by debris that might fall from the ceiling as the risk of a wet floor. Even assuming the signs did caution about a "wet floor" as AMC suggests, a wet floor is not the hazard that Davis alleges to have caused her fall. A reasonable jury could conclude that a sign warning of a "wet floor" is insufficient to guard against a slippery condition that might not appear "wet" to an approaching patron who in turn might assume that the hazard had dried. And even if the yellow caution signs sufficiently warned that a generic slippery condition existed on the floor, a question still would exist under the present circumstances as to precisely what area of the floor posed the risk, *i.e.*, the area directly underneath the signs, the area between the two signs, the area immediately surrounding the signs, or the area of the exit corridor as a whole.

The court observes first that AMC's argument is not the one traditionally seen where a business owner attempts to justify its lack of warning by asserting that an open and obvious condition required no such warning. Here, the record reflects that AMC <u>did</u> provide a warning in the form of two yellow caution signs described as "wet floor" signs. The court previously has addressed those warnings and concluded that a genuine dispute of material fact exists as to their adequacy. There also is insufficient evidence in the record for the court to determine at the summary judgment stage that the alleged hazard, *i.e.*, the alleged butter residue, itself presented an open and obvious condition. Davis specifically testified under oath that she was unable to see any substance on the floor even after her fall (Doc. 37-2 at p. 10, depo. pp. 34, 36)—notwithstanding that a patron allegedly confirmed "something shiny" on the floor (*id*. at p. 12, depo. p. 42) and that AMC personnel determined "another mopping with degreaser" was needed (Doc. 37-5).

Even assuming AMC could merge the two concepts into an argument that its warning rendered the alleged hazard open and obvious, it would fail at this stage for the reasons already discussed. In short, the fact that the surveillance video shows Davis and numerous other patrons walking directly next to the yellow caution signs calls into question the efficacy of those signs in addressing the particular hazard at issue in the particular location at issue with the particular lighting conditions at issue. *See Logan's*, 2016 WL 4585927 at *5 (finding issue of fact presented where "the exact placement of the sign and the extent to which it effectively warned customers of the wet floor in the women's restroom is disputed"); *Eaton v. Westrock Coated Board, LLC*, 601 F. Supp. 3d 1206, 1212 (M.D. Ala. 2022) (holding that whether warning was sufficient to adequately warn of a hazard presented "a question of fact for the jury" (citing *Pittman v. Hangout in Gulf Shores, LLC*, 293 So. 3d 937, 944 (Ala. Civ. App. 2019)); *Ex parte Kraatz*, 775 So. 2d 801, 804 (Ala. 2000) (explaining that lighting conditions can present "variable factors"

that render an open-and-obvious defense "not appropriate for resolution by summary judgment"); *Byrne v. Fisk*, 385 So. 3d 973, 987 (Ala. 2023) (same).

Stated differently, a reasonable jury could conclude that evidence regarding actual patron behavior when approaching from the darker theater/hallway area is more probative to the question of whether the yellow caution signs provided sufficient warning than is surveillance video from the perspective of an elevated camera facing the opposite direction. *See Joseph*, 2026 WL 1262203 at *4 ("Whether an alleged danger is open or obvious is an objective inquiry. A hazard is open and obvious if it would be apparent to, and recognized by, a reasonable person in the position of the invitee." (citation modified) (emphasis added)). Because "[q]uestions of openness and obviousness of a defect or danger ... are generally not to be resolved on a motion for summary judgment," and because the Alabama Supreme Court has stated that "[e]xceptions to this general rule are narrow" and "permitted only in circumstances where reasonable minds could not differ regarding the obviousness of the danger," the adequacy of the yellow caution signs and whether those signs rendered the condition causing Davis's fall "open and obvious" thus are within the exclusive purview of a jury. *McClurg v. Birmingham Realty Co.*, 300 So. 3d 1115, 1119 (Ala. 2020) (citations modified) (collecting cases).[4]

---

[4] The court notes it significant that the exit corridor where the yellow warning signs were placed would not have been visible to Davis when she entered into the AMC theater earlier in the day. (Doc. 37-2 at p. 10, depo. p. 35; Doc. 37-3). The court further notes that, to the extent AMC contends the statements Davis alleges were made by an unidentified AMC employee are hearsay and "cannot be presented in a form admissible at trial" (Doc. 44 at p. 3), Rule 801(d)(2)(D) of the Federal Rules of Evidence excludes from the definition of hearsay any statement that "is offered against an opposing party and … was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." The unidentified AMC employee's statements as referenced herein fall within that exception and therefore may be considered for purposes of summary judgment. Regardless, the other evidence of record—particularly the surveillance video and written statement that Davis "slipped where we had some butter tracked out from our popcorn station"—would be more than enough to support a denial of summary judgment on the negligence claim.

### C. Premises Liability

Count Three of the Complaint is entitled "Premises Liability" (Doc. 1-2 at p. 13) but essentially is a rehash of the claim asserted in Count One for "Negligence" (*see id*. at ¶¶ 24-29). "In a premises-liability case, the elements of negligence are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages." *Joseph*, 2026 WL 1262203 at *3 (citation modified). Accordingly, the legal issues raised in Count Three are subsumed by those presented in Count One.

### D. Respondeat Superior

Count Four of the Complaint is entitled "Respondeat Superior." (Doc. 1-2 at p. 15). Although Alabama law does permit tort liability to be imposed vicariously through that doctrine, the analysis must be conducted as part of the underlying tort claim(s) and not via a freestanding count, *i.e.*, there is no such independent cause of action. *See Ex parte City of Birmingham*, No. SC-2024-0700, 2025 WL 2680098, *2 n.1 (Ala. Sept. 19, 2025) (explaining that "the doctrine of 'respondeat superior' is a theory of liability, not a legal claim") (citation omitted). Davis therefore cannot proceed under Count Four separate and apart from her substantive claim for "Negligence" in Count One.

## VI. Conclusion

For the reasons set out above, and given the requirement at this stage to view evidence in the light most favorable to Davis as the non-movant, it is hereby **ORDERED** that the pending motion for summary judgment filed by AMC (Doc. 36) is **DENIED** as to the claim for negligence but otherwise **GRANTED**. Trial shall proceed on December 14, 2026 solely as to Count One.

**DONE** this the 10th day of November 2026.

**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**